## Anderson v. Commonwealth.

(Decided May, 13, 1938.)

J. W. CAMMACK and J. L. VALLANDINGHAM for appellant.

HUBERT MEREDITH, Attorney General, and WILLIAM HAYES, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

At the October, 1934, term of the Owen circuit court, the grand jury returned an indictment against appellant and one Robert Watson, charging them with the offense of grand larceny. The indictment, in the usual form, charged that defendants stole six head of sheep, the property of Byron Donnely, Howard Tackett, and John Samford.

Watson was tried some time in the year 1935, convicted and sentenced to the penitentiary, and has served his term. Appellant was tried at the July, 1937, term of court and sentenced to the penitentiary for one year. He has appealed from that judgment, insisting on a reversal of same upon the ground that once the evidence of the accomplice, Watson, is eliminated, the evidence is insufficient to sustain a conviction.

It is shown by the evidence that appellant and Watson took the sheep in question from the farm of Samford, one of the co-owners, and took them to Cincinnati in an automobile truck belnging to appellant and sold them to a Cincinnati livestock dealer.

Watson, the principal witness for the Commonwealth, testified that he met with appellant at New

Liberty in Owen county and they went to Mr. Samford's place and loaded the sheep on the truck and took them to Cincinnati and disposed of them as stated above; that at the suggestion of appellant the check was made payable to him, appellant, and they cashed the check and appellant gave him $6 of the money. On cross-examination Watson was asked if he told certain people a few days before the trial that he stole the sheep and that appellant had nothing to do with it and he said he made that statement. He was further asked if he told certain people, including appellant's attorney, that some of the owners of the sheep, and perhaps others, told him that they would give him $5 each if he would testify that appellant helped him steal the sheep. He admitted making that statement, but explained that that conversation was in connection with another matter and had nothing to do with the sheep·in question. Even though the witness made conflicting statements, that went only to the credibility of his evidence, and it was the province of the jury to believe his former statements or the ones made at the trial.

Riley Watson, father of Robert Watson, testified that some time before the trial appellant came to him and wanted him to go to Frankfort and tell Robert Watson to testify that he alone stole the sheep and appellant had nothing to do with it. He said that on the evening or night the sheep were stolen appellant was at his home in company with his son, Robert Watson, and that they came there in a truck belonging to appellant and stayed there until about sundown; that appellant, who was engaged in gathering up and selling scrap iron, got some aluminum off an old discarded car and loaded it in his truck.

Appellant, testifying in his own behalf, stated that he had been engaged in the trucking business since the year 1928, hauling iron, cattle, and anything that people might employ him to haul, and he had hauled livestock to the market for various people on different occasions. He admitted that he was on the Samford farm at the time the sheep were taken but said he went there to get some iron; that he already had some iron in his truck when he got there and got some more at the Watson place. He admitted hauling the sheep in question to Cincinnati but explained that he hauled them for Robert Watson; that Watson asked him to haul the sheep to market for him; that he had no rack on his

truck or equipment to haul sheep or cattle but he arranged the parts of an old Ford car and made a crosspiece to serve as a guard rail or rack so that he could keep the sheep on the truck. He said the sheep were in a barn and that Watson put them on the truck but he did not help or assist him. He said that was late in the afternoon about sundown and he drove along the highway by Samford's place when on his way to Cincinnati. He said the sheep were sold in his name because he thought he could get a better grade on them than Watson could get, because he knew the boys there who did the grading; that he went to get the ticket and came back to the truck and the check was made out in his name and they got it cashed and Watson paid him 75 cents a head or $4.50 for hauling the sheep, which was in accordance with their previous agreement.

On cross-examination appellant was asked when he first found out that the sheep were stolen and he said he heard about it on Monday of the following week after he had taken the sheep to market on Thursday or Friday before. He was asked if he looked for the sheriff or made any effort to inform the sheriff or other officers about Robert Watson taking the sheep and the circumstances under which he hauled them, and he said he did not because he was not there; that soon after he hauled the sheep to Cincinnati he went to Wyoming, Ohio, on a visit and had been staying there since that time until he was arrested on his return home on a visit. He had been home on previous visits but was not at home any time in the years 1935 or 1936, but later corrected the statement and said that he was at home three times in 1936. He said he was at Owenton at one time but did not "walk around any" but stopped at a gas station on his way back to Cincinnati. He was asked and answered as follows:

"Q. Did you look up the sheriff then? A. No, I did not.

"Q. Why didn't you come and report here where you on your truck had hauled some sheep; that you found out on Monday some had been stolen; that the lambs you hauled in your truck you had sold in your name; that you got the check for them? Why didn't you come up here and help these officials clear that thing up? A. During the time—the reason why? It was because I got a job.

"Q. It wouldn't have taken an hour? A. Have

taken an hour? I had a job that counted for my time, being there, if I lost that job, you don't pick them up every day.

"Q. When did you get that job? A. I got a job driving a garbage truck for the village of Wyoming, driving a truck.

"Q. Why did you leave the day you heard about these sheep? A. I didn't leave, I had already gone.

"Q. You never talked to anyone about it? A. No, I didn't.

\* \* \* \* \*

"Q. Did you try to get away from the sheriff when he arrested you? A. Sure.

"Q. Huh? A. Sure I tried to get away from the sheriff.

"Q. Why did you try to get away? A. Well, for self-preservation means, for I am trying to take care of myself. I have got a job that means everything to me, and if I don't keep that job, I might go back there and try to get another job— they expect me to be there on the job, they have confidence enough in me to know what I tell them I will do, I will do. I am off for my trial, I want to explain it to them. If I am not back there, what will they say.

"Q. You asked the sheriff to give you a break and let you go? A. Why? Because he had hold of my arm.

"Q. Because he had hold of your arm? A. Yes, sir. No, not let me go, let go of me. I haven't got but one arm and he was holding me. If I had wanted to scratch myself I couldn't have done so."

Appellant also denied the statement of Robert Watson that he met with him at New Liberty and drove with him in his truck to the Watson home, and further denied knowing that the sheep were stolen and thought that they were Robert Watson's sheep, and that he hauled them in good faith for hire.

It appears that the only direct evidence that appellant participated in the stealing of the sheep consists of the testimony of Robert Watson, the accomplice, which is corroborated by the circumstances. The father of Robert Watson testified that appellant came

to his home in company with Robert Watson and they stayed there until the late afternoon and then departed. They loaded the sheep on the truck and set out for Cincinnati at about sundown or near dark, according to appellant's evidence, but Robert Watson said that they had turned the lights on. But in any event they made the major portion of the trip from Owen county to Cincinnati after dark. At appellant's suggestion the check for the sheep was made payable to him and the only explanation he offers is that he thought he could get a better grade on the sheep than Watson could get. He testified that he had been in the trucking business since the year 1928 up until the time the sheep were stolen, during which time he lived in Owen county. But within a short while after the sheep had been stolen he immediately left the state and went to the state of Ohio and stayed there a year and a half or two years before he returned to Owen county, Ky., and when he did return it was on brief visits only. He admitted that he never told the sheriff of Owen county or other officers anything about the sheep having been stolen or his connection therewith. He said he told the man for whom he worked in Ohio about the incident but told no one in Owen county about it, although according to his evidence he was in and out of Owen county, Ky., two or three times before he was arrested. He also admitted that when he was arrested he tried to get away from the sheriff "for self-preservation" and because he had a job in Ohio.

The fact that appellant left the state soon after the offense was committed is a circumstance from which guilt might be inferred.

In Booher v. Com., 266 Ky. 809, 100 S. W. (2d) 830, it is said (page 833):

"Booher admitted that about a week after the offense was committed and after he had heard about the meat being found in Melton's possession, he left the state and went to the state of Arkansas and stayed five weeks. No indictment having been made against him at that time, he returned to his home, but within a short while he again left the state and went to the state of Indiana. His conduct in fleeing soon after the offense was committed was a competent circumstance for the consideration of the jury, from which guilt might be in-

ferred. True it is that at the time he fled he had not been charged with the offense. But it is the rule that the Commonwealth may show that one charged with an offense fled the country or the jurisdiction of the court even before any charges were formally preferred. Rogers v. Com., 161 Ky. 754, 171 S. W. 464; Plummer v. Com., 1 Bush (64 Ky.) 76. Perhaps the jury applied the biblical philosophy 'the guilty flee when no man pursueth.' ''

All the circumstances considered in connection with the proven and admitted facts, it is obvious that the testimony of Robert Watson was abundantly corroborated and that the evidence is sufficient to sustain the verdict.

Judgment affirmed.